UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at CHATTANOOGA


MAUREEN DEAL and PHILLIP DEAL,  )
on behalf of ZACHARY DEAL, an infant  )
child with a diability,  )
  )
     *Plaintiffs,*  )
  )     No.1:01-cv-295
*v.*  )
  )     *Edgar*
HAMILTON COUNTY DEPARTMENT  )
OF EDUCATION,  )
  )
     *Defendant.*  )


# MEMORANDUM

The United States Court of Appeals for the Sixth Circuit has remanded this action to this

Court to determine whether defendant Hamilton County Department of Education ("HCDE")

committed a substantive violation of the Individuals with Disabilities Education Act, 20 U.S.C. §

1401 et seq. ("IDEA"), by its proposed educational programs developed for Zachary Deal.[1]  The

plaintiffs, Maureen Deal and Phillip Deal on behalf of their autistic son Zachary, began this

litigation by requesting an administrative due process hearing claiming that HCDE violated a

number of procedural and substantive provisions of the IDEA.

After a twenty-seven day hearing, the administrative law judge ("ALJ") found for the

parents on a number of their claims.  This Court reversed, finding HCDE's acts met both the

---

[1] Congress revised the IDEA effective July 1, 2005.  *See* Pub.L. No. 108-446, Tit. I, §
101, Tit. III, § 302(a), 118 Stat. 2647, 2803 (2004).  However, this Court will apply the law as it
existed prior to 2005 because all of the relevant facts in this case occurred before that time.  *See
Kenton County Sch. Dist. v. Hunt*, 384 F.3d 269, 283 (6th Cir. 2004); *Tucker v. Calloway County
Bd. of Educ.*, 136 F.3d 495, 500-01 (6th Cir. 1998).

substantive and procedural requirements of the IDEA. *Deal v. Hamilton Cty. Dept. of Educ.,* 259

F.Supp.2d 687 (E.D. Tenn. 2003). The Sixth Circuit reversed this Court with respect to a

number of the alleged procedural violations, but remanded for determination of substantive

issues and an appropriate amount of reimbursement. *Deal v. Hamilton Cty. Bd. of Educ.*, 392

F.3d 840 (6th Cir. 2005). This opinion addresses only the question of the substantive

appropriateness of HCDE's individualized education programs ("IEPs"). The Court will address

the appropriate amount of reimbursement in a later opinion.

## I.       Issues on Remand

The Sixth Circuit has directed this Court to "consider all of the evidence in this case,

giving due deference to the ALJ's findings, in determining whether a substantive IDEA violation

occurred under the meaningful benefit standard." *Deal*, 392 F.3d at 865. Plaintiffs argue that

this Court should also review HCDE's denial of Extended School Year ("ESY") services to

Zachary for two years, review HCDE's alleged denial of related services for Zachary, and review

whether HCDE offered Zachary an appropriate program in the least restrictive environment

("LRE") in accordance with the IDEA. The Court notes that review of two of these issues are

clearly not part of this Court's obligations on remand. The Sixth Circuit noted that

> [plaintiffs] do not seek relief from this Court on the basis of the district court's
> denial of related services reimbursement, so the Court need not reach that issue.
> The Court also need not analyze the LRE issue since, even if the Court were to
> find that the 1999-2000 IEP violated the LRE requirement, there would be no
> basis upon which to reverse the ALJ's determination regarding the statutory
> notice.

*Deal*, 392 F.3d at 865 n.18. Thus, this Court will not address HCDE's alleged failure to provide

related services or HCDE's alleged failure to provide an education in the least restrictive

environment ("LRE") under the IDEA.

-2-

This Court further finds that the plaintiffs did not raise the issue of ESY on appeal. The Sixth Circuit has held that "[t]he law-of-the-case doctrine bars challenges to a decision made at a previous stage of the litigation which could have been challenged in a prior appeal, but were not." *U.S. v. Adesida*, 129 F.3d 846, 850 (6th Cir. 1997) (citing *County of Suffolk v. Stone & Webster Engineering Corp.*, 106 F.3d 1112, 1117 (2d Cir. 1997)); *see also, Rouse v. Daimler Chrysler Corp.*, 300 F.3d 711, 715 (6th Cir. 2002). Although plaintiffs attempt to relitigate the ESY question on remand, they did not raise ESY as a specific issue in the Sixth Circuit, and they only briefly mentioned ESY in their brief on appeal. [Court Doc. No. 86-2, p. 31]. The Sixth Circuit has held that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived." *Indeck Energy Servs., Inc. v. Consumers Energy Co.*, 250 F.3d 972, 979 (6th Cir. 2000) (citing *United States v. Layne*, 192 F.3d 556, 566-67 (6th Cir. 1999)). Thus, this Court determines that the issue of whether HCDE improperly denied ESY to Zachary is not before this Court on remand.

## II.     Factual Background

### A.     Zachary Deal's Potential

Both this Court and the Sixth Circuit have provided factual background in this case. *Deal*, 259 F.Supp.2d 687; *Deal*, 392 F.3d 840. Therefore, this Court will summarize only the salient facts here. The Sixth Circuit has ordered this Court to reconsider its findings on the substantive appropriateness of HCDE's proposed IEPs while " 'carefully consider[ing] the student's individual abilities.' " *Deal*, 392 F.3d at 865 (quoting *Ridgewood Board of Educ. v. N.E.*, 172 F.3d 238, 248 (3d Cir. 1999)). Therefore, this Court has carefully analyzed the evidence pertaining to Zachary's potential and skills. Further, because of the need to give "due

weight" to the ALJ's determinations of credibility, this Court relies primarily on the testimony of witnesses before it and the witnesses in the administrative hearing whom the ALJ deemed credible.

Zachary was born on July 19, 1994.  Administrative Hearing Transcript ("Admin. Tr.") Vol. II, Mulick Testimony ("Test."), p. 539.  Dr. B.J. Freeman, one of the experts from whom this Court heard additional testimony, testified in this Court about her efforts to assess Zachary's potential.  Dr. Freeman is a professor of medical psychology at the UCLA School of Medicine and is also the Director of Autism Services at UCLA.   Additional Evidence Hearing ("Addit. Evid."), Vol. II, Freeman Test., p. 432.  She testified based on her knowledge of giving Zachary intelligence assessments when he was eight years old.  *See id.*, Vol. II, p. 439, 449.  She described Zachary as having "a wide scatter of abilities" who performed only a year below his age level in visual skills.  *Id.*  She also noted that Zachary's "language is very, very impaired." *Id.*  Zachary was unable to "score some on the language test."  *Id.*  Zachary has "splinter skills," meaning that he could display high levels of certain skills and much lower levels of other skills. *Id.* at 515-16.  In 2002 when Zachary was eight years old, Dr. Freeman observed that he still did not have a functional communication system.  *Id.* at 480.

While Dr. Freeman did not assess Zachary as mentally retarded or cognitively impaired, she indicated that Zachary "functions as a child who is mentally retarded."  She further elaborated that, "I'm not convinced that's a representation of what Zachary's potential is, because he has really good skills in some areas, and he has verbal dyspraxia."  Addit. Evid., Vol. II, Freeman Test., p. 453.

The ALJ found that Zachary's intelligence quotient ("IQ") tested within the average

-4-

range in April of 1998 with a score of 93 and in June of 1999 with a score of 105. *Hamilton County Dept. of Education*, 103 LRP 28693, 9, 12 (Aug. 20, 2001) ("Admin. Op."); *see also*, Admin. Tr. Vol. I, p. 126. However, Zachary obtained these scores on the Leiter IQ test, which is a nonverbal test that "measures different skills" than other recognized IQ tests, and it measures primarily matching skills for younger children. Addit. Evid., Vol. II, Freeman Test., p. 455. Dr. Freeman clarified that the manual pertaining to the Leiter IQ test indicates that it "should never be taken as the measure of innate capacity for children. And the second thing it says is that the Leiter scores are never to be used to reflect a child's potential without corroboration from multiple sources of information." *Id.* Further, Dr. Freeman clarified that the "Leiter consistently overestimates." *Id.* at 456. Dr. Ilene Schwartz, HCDE's expert on autism at the administrative hearing, testified that success on an IQ test and success in life or in school are not always correlated. Admin. Tr. Vol. XXV, Schwartz Test., p. 6686. Dr. Schwartz further testified that the Leiter IQ test is not a "full-scale test." *Id.* at 6693. HCDE's school psychologist, Donna Palmer, testified that the Leiter IQ test is a "narrow measure" that is not particularly useful in predicting how well a child will perform in school. Admin. Tr. Vol. XVII, Palmer Test., pp. 4797-98; *see also* Admin. Tr. Vol. XVIII, pp. 4846-47.

In addition, Zachary's standard scores on the Vineland Adaptive Behavior Scales from 1997 to 2002 actually decreased over time. Addit. Evid., Vol. II, Freeman Test., pp. 458-59; Administrative Hearing Exhibit ("Admin. Ex.") 515; Admin. Tr. Vol. XVII, p. 4818. The Vineland measures a broader and wider range of domains than IQ tests. Admin. Tr. Vol. XXV, Schwartz Test., p. 6751. In addition, Zachary's standard scores on the Mullen Scales of Early Learning were very low at age three with standard scores ranging from the 1st percentile to below

the first percentile. Admin. Ex. 46. These scores also declined over time. Addit. Evid., Vol. II,

Freeman Test., p. 459. Thus, other assessments did not corroborate Zachary's Leiter IQ scores.

*Id.*

Even Dr. Susan Speraw, upon whom the ALJ relied extensively, determined that

although Zachary had an IQ in the average range, some concerns remained. She testified that

"[t]here were concerns, however, because on the Vineland scale, his adaptive behavior was

certainly not anywhere near to what you would expect of a child who had an average intellectual

capacity, and his developmental score remained very low, especially–well, it was low overall,

but in the language skills especially." Admin. Tr. Vol. I, Speraw Test., p. 127. In addition,

Zachary's social development and communication scores were very low. *Id.* at pp. 127-28.

Plaintiffs' expert, Dr. Mulick, noted that Zachary's "biggest problem is still the

production of easily understood speech or some kind of communication system." Admin. Tr.

Vol. II, p. 500. Dr. Mulick also testified that although Zachary scored in the average range on

the Leiter, a nonverbal IQ test, Dr. Ivar Lovaas used a verbal IQ test in his research in the 1980s,

which is a "fairer test." *Id.* at p. 507; *see also* Admin. Tr. Vol. XVII, p. 4776.[2] Dr. Mulick

further noted that autistic children would need to "show average learning abilities in a linguistic

environment" as long as schools "remain language-based." Admin. Tr. Vol. II, Mulick Test., p.

---

[2]Dr. Ivar Lovaas, a professor at UCLA, conducted a study on methodologies for teaching children with autism in the 1980s. He used a form of applied behavior analysis ("ABA") involving intense discrete trial teaching ("DTT") for a number of hours per week, in some cases as much as 30 to 40 hours a week or even more. His study followed nineteen children, and the best outcome students of the group became "indistinguishable" from regular education students in a regular classroom. A total of 47% of the students in the study became "indistinguishable." *See e.g. Deal*, 392 F.3d at 846 n.2; Admin. Op., p. 7.

508.  At the administrative hearing Dr. Mulick noted that Zachary was "getting toward the end of what I think of as the window for fluent speech."  *Id.* at p. 528.  He recommended that more work be done on Zachary's communication needs and more teaching, not by conventional speech therapy, but by "incidental teaching."  *Id.* at p. 529.  Keith Amerson, another of plaintiffs' witnesses, testified that Zachary still needed to work on the area of communication.  Admin. Tr. Vol. III, Amerson Test., p. 889.

Zachary's private speech therapist, Anna Davenport, described Zachary's skills in this way:

> Zachary is more severe than a lot of the autistic children that I've worked with. He is at this point five years old and still primarily nonverbal, and so I feel like that's a crossroads for him, because at this point we're considering augmentative communication to help to pull his expressive communication abilities up to the level of his auditory comprehension skills.

Admin. Tr. Vol. IV, p. 980.  At the time of the administrative hearing in 2000, Ms. Davenport testified that Zachary was "still primarily nonverbal." *Id.* at 1016.  Zachary's preschool teacher from HCDE, Lisa Steele, testified that Zachary was the "least verbal" of all the children in her classroom.  Admin. Tr. Vol. V, Steele Test., p. 1323.  She noted that Zachary's greatest deficits were in the areas of language, communication, and socialization.  *Id.* at p. 1388.  Based on her experience, Ms. Steele felt that Zachary's intelligence level was significantly below average and lower than the other children in her classroom.  *Id.* at p. 1478.  By the time of the administrative hearing in 2000, HCDE's school psychologist, Donna Palmer, testified that Zachary had not made progress "relative to his peers" in some "very, very important areas if we are hoping for Zachary to be able to be integrated into a program with same-age peers or near-age peers." Admin. Tr. Vol. XVIII, Palmer Test., p. 4842.

One of HCDE's speech and language pathologists ("SLP"), Jan Lewis, testified that in 1999 Zachary did not "have the idea to communicate." Admin. Tr. Vol. XXI, Lewis Test., p. 5674. In addition, she testified that Zachary scored the lowest possible score – the 1st percentile– on a test for use of vocabulary in language. *Id.* at p. 5682. She also noted that because of Zachary's verbal apraxia (also called dyspraxia) there was a "good chance" that he might not be verbal. *Id.* at 5690. She was "very concerned that Zachary is 6 years old and he can't communicate." *Id.* at 5691; *see also, id.* at p. 5710.

Even Zachary's parents acknowledge his deficits. His father, Mr. Deal, testified that Zachary's communication delay was "so tremendous." Admin. Tr. Vol.XII, Phillip Deal Test., p. 3504. Mr. Deal further testified that Zachary has "extreme deficits" and "his needs are great." *Id*. at Vol. XIII, pp. 3665, 3721. By the time Zachary was four-years old, his parents agreed that he was non-verbal and was at a 12-month old level for expressive communication and an 18-month old level for receptive communication. Admin. Ex. 113. Mr. Deal testified that by 2000 Zachary still did not have functional expressive vocal language skills. Admin. Tr., Vol. XIII, p. 3794. Mrs. Deal acknowledged that at age six Zachary did not understand what a typical six-year-old would understand and that he had very little speech. Admin. Tr. Vol. XV, Maureen Deal Test., pp. 4232, 4460.

The ALJ found that Zachary was one of the better students academically in his private preschool class Primose. Admin. Op., p.10. However, this Court heard expert testimony from Dr. Ronald Leaf that he personally did not see any evidence that Zachary was one of the better students in his preschool class academically. Addit. Evid., Vol. I, Leaf Test., p. 9. Dr. Leaf holds a doctorate in psychology from UCLA and worked with Dr. Lovaas on his Young Autism

Project at UCLA. *Id.* at 15-18. Dr. Leaf reviewed the videotapes of Zachary at his preschool

class. *Id.* at 72-73. Further, Zachary was quite "distinguishable" in his preschool class due to

the presence of an aide, his inattention and his self-stimulating behaviors. *Id.* at 79. Dr. Leaf

also expressed his opinion of whether Zachary was in the "best outcome" group described in the

1987 Lovaas study:

> And, clearly, by our research at UCLA, he was not in the best outcome, not only
> was he at that age quite distinguishable from the kids by that age that were in the
> best outcome group not because all of the kids did have language that were in that
> group by that age, but they also didn't have some of the behaviors that he had
> exhibited, like the self-stimulation and inattention. The best outcome of that
> group weren't prompt dependent. They were in kindergarten without aides,
> certainly, in first grade certainly without aides as well. . . . Zachary certainly
> didn't meet those criteria of best outcome. The other things that he didn't meet of
> best outcome, we saw the kids that were passive didn't do well. Kids with early
> language did well. And he didn't –he was passive, and he didn't have early
> language. So, again, it would be hard to place Zachary in the best outcome group.

Addit. Evid, Vol I, Leaf Test., p. 82-83.

By kindergarten, Zachary was still communicating primarily by gesturing and pulling

adults to something he wanted. Addit. Evid., Vol. I, Hixson Test., p. 162. By 2002, at the age of

eight, Zachary was completing simple addition when presented in a certain way, matching some

words, and reading twenty-two simple words; however, Zachary still had not developed a

functional communication system–the "precursor to being able to function in society." Addit.

Evid., Vol. II, Freeman Test., p. 489, 511; Addit. Evid., Vol. I, Farrar Test., p. 200.

**B.      Substantive Programs Offered by HCDE**

Upon the Deals' introduction to HCDE, HCDE provided the Deals with options such as a

TEACCH-based classroom with all autistic children or another classroom for children with

disabilities at a private preschool that served disabled students, but the Deals were not interested

in those placements for Zachary. Admin. Tr., Vol. XVI, Maureen Deal Test., pp. 4386-87.

TEACCH is a well-known methodology for teaching autistic students. The Deals also were not

interested in a special education classroom at Westview Elementary because they thought the

classroom seemed too advanced for Zachary. *Id.* at 4387-88.

In July of 1997, an IEP team met to discuss an interim IEP for Zachary. Admin. Ex. 29.

The interim IEP provided that Zachary would receive services in the Ooltewah Elementary

School Comprehensive Development Class ("CDC"). *Id.*; Admin. Op., p. 6. The classroom

consisted of children with varying disabilities. Admin. Op., p. 6. The IEP provided for a 30-day

interim period for Zachary to adjust to the curriculum in the preschool classroom with speech

and language therapy to be provided twice weekly for 45 minutes a session. Admin. Ex. 29.

The IEP provided that Zachary would participate in the curriculum to determine his needs in fine

motor, gross motor, self-help, socialization, readiness, and language. *Id.* His goals included

following a daily schedule, relating to peers and adults in the classroom, and participating in

language therapy. *Id.* The IEP team rejected the option of a regular preschool classroom as not

providing enough support and also rejected the option of providing only speech and language

therapy. *Id.* The parents agreed with the interim IEP. *Id.* Lisa Steele was to be the preschool

teacher, and the parents had great confidence in her. Admin. Op., p. 6

On October 15, 1997, Zachary's IEP team again met to draft an IEP for the 1997-1998

school year. Admin. Ex. 35. The IEP provided that Zachary would attend the CDC classroom

and have speech and language therapy twice weekly for 30 minutes a session. *Id.* The IEP's

goals and objectives included goals in fine motor skills, social and behavioral skills,

communication, prevocational skills, gross motor skills, self-help skills and readiness skills. *Id.*

-10-

It included a listing of Zachary's behavior problems and ways to deal with them. The IEP included Zachary's present levels of performance in all skill areas and included such goals for Zachary as: cutting on a line; tracing lines on paper; drawing symbols; tossing a ball with another child or adult; learning signs; putting away his belongings; identifying his name in print; riding a tricycle; walking down stairs with alternating feet; swinging a bat; dressing himself; blowing his nose; washing hands and face; matching colors, shapes, symbols, and letters; participating in Clark Early Language program; and greeting peers. *Id.* The IEP also provided for team meetings three times throughout the school year to review progress and address questions related to Zachary's program. Admin Ex. 35. The parents agreed with this IEP. *Id.*

During the 1997-1998 school year, the parents began exploring Lovaas-style applied behavior analysis ("ABA") therapy for Zachary. Admin. Op., p. 6. Zachary attended the HCDE CDC classroom five days a week until March 1998 when the parents expanded an ABA program for Zachary at home. Admin. Op., p. 7. After that time, Zachary's parents reduced his time in the CDC classroom. In May of 1998, Zachary's IEP team met, and his parents presented the results of their ABA program developed with the Center for Autism and Related Disorders ("CARD") and asked HCDE to fund the program. *Id.* The IEP team declined to fund an ABA program for Zachary for the summer, but offered an appropriate ESY program for Zachary. *Id.*

Lisa Steele had nine years of experience teaching special education preschool classes at the CDC preschool when Zachary joined her class. Admin. Tr., Vol. V, Steele Test., p. 1307. Ms. Steele utilized "a whole toolbox of ways that [she] could get the curriculum to each individual child." *Id.* at 1308. She based her curriculum on the kinds of things a preschooler needed to learn and individualized the program for each child depending on his or her skills and

needs. *Id.* Ms. Steele's toolbox might include, visuals, signs, verbalizations, and pictures. *Id.* at

p. 1417. She combined group instruction with one-on-one instruction. *Id.* at 1319. Ms. Steele

worked on communication goals throughout the day. *Id.* at 1336. She worked with Zachary

continuously on his functional communication skills. *Id.* at 1470, 1436. She used structured

teaching strategies. *Id.* at 1471. She sent notes on Zachary's behavior home to the parents on a

daily basis. *Id.* at 1328-29; Admin. Tr., Vol. V, p. 1399; Vol. XVII, p. 4655. Ms. Steele testified

that she observed Zachary's skills to be increasing while he was in her program and that he was

"learning to learn." Admin. Tr., Vol. V, pp. 1321, 1468.

In October of 1998, the IEP team met to draft Zachary's IEP for the 1998-1999 school

year. Admin. Op., p. 9. HCDE personnel suggested 78 goals, and the parents suggested 600

goals for Zachary. *Id.* The IEP team incorporated 137 of the 600 goals recommended by the

parents into Zachary's IEP. *Id.* The parents filed a minority report expressing their

disagreement with the IEP. *Id.*

The first twelve pages of the 1998-1999 IEP include Zachary's present levels of

performance with input provided by both HCDE staff and the parents. Admin. Ex. 105. The

goals and objectives are numerous and detailed, and the IEP itself contains information regarding

Zachary's progress on the goals for each quarter. *Id.* Mrs. Deal agreed that the IEP included a

very long and detailed set of goals and objectives. Admin. Tr., Vol. XVII, Maureen Deal Test.,

p. 4614. The goals cover the areas of fine motor skills, articulation, communication, readiness,

receptive language, gross motor skills, behavioral skills, social skills, self-help skills, and pre-

vocational skills. Many of the goals were met, some progress was made on others, and on ones

where little progress was made, it appears that the reason for this is that HCDE staff felt that

-12-

more time was needed.  *Id.*  The IEP included two weekly sessions of speech therapy for 30 minutes each, 2 hours per month of occupational therapy, and physical therapy three times per year.  *Id.*  The IEP also provided for communication assistance in 3 sessions a day of 15 minutes each in either individual or group therapy.  *Id.*  In addition, the IEP provided for individual and group therapy in fine motor, gross motor, self-help, receptive language, social, behavior, and readiness skills.  *Id.*  The IEP included information on Zachary's self-stimulating and other disruptive behaviors and ways to deal with such behaviors.  *Id.*

Paula Wiesen, a certified speech and language pathologist, was Zachary's preschool teacher for the 1998-1999 school year.  Admin. Tr., Vol., XVI, p. 4533; Vol. V, p. 1497.  Ms. Wiesen had worked with numerous autistic students before working with Zachary and had eight years experience in special education.  Admin. Tr., Vol. V, Wiesen Test., pp. 1497, 1502. Again, services were delivered in a special education preschool class including students of varying disabilities.  Zachary attended HCDE's program only 16% of the offered time in the 1998-99 school year due to his parents' decision to increase the time spent in his ABA program. Admin. Tr., Vol. V, p. 1523; Addit. Evid., Vol. II, p. 484.  Mrs. Deal emphasized that "functional communication was used a whole lot by Paula Wiesen."  Admin. Tr., Vol. XVI, Maureen Deal Test., p. 4390.  In addition, Ms. Wiesen began sending the parents daily reports beginning in February of 1999.  Admin. Tr., Vol. XVII, p. 4656.

In August of 1999, the IEP team met to draft Zachary's IEP for the 1999-2000 school year.  The IEP included Zachary's present levels of performance contributed by both HCDE staff and by parents according to progress made in his ABA program.  Admin. Ex. 253.  The suggested placement was a return to Ms. Wiesen's special education preschool classroom with

-13-

participation in the regular kindergarten classroom for 15 minutes three times weekly with the assistance of an aide. *Id.* Participation in the regular kindergarten classroom was to "increase as tolerated." *Id.* Zachary's goals and objectives included goals in social/behavioral skills, adaptive skills, fine motor skills, gross motor skills, self-help skills, communication, pre-vocational, and readiness skills. *Id.* The IEP included annual goals such as tolerating and interacting with peers in a cooperative activity; printing his first and last name independently, using a model; performing basic feeding/eating preparation skills; and expressing his needs and wants in the school environment. Each annual goal was then broken down into a series of several detailed short-term objectives such as, working independently at a task for 4 minutes, 6 minutes, 8 minutes, and 10 minutes; demonstrate quantities of 1 to 5; touch body parts on self, mouth, eyes, hands, arms, legs, fingers, thumb, neck and stomach when instructed; consistently express yes/no in response to others; make choices using a choice board. *Id.* The placement provided for 6.5 hours per day of special education instruction, 30 minutes a day 5 times a week of individualized speech therapy, occupational therapy two times a month for 30 minutes, and physical therapy once a week for thirty minutes.

Zachary did not access the HCDE program at all during the 1999-2000 school year. The parents instead enrolled him in a private preschool and continued his ABA therapy program at home. *See* Admin. Tr., Vol. XXIV, p. 6374; *Deal*, 392 F.3d at 847.

David Rostetter, a "nationally recognized expert in the field of IDEA compliance who has published and presented extensively in the field, who assisted in drafting the original IDEA regulations", opined that HCDE's IEPs would have provided a free appropriate public education ("FAPE") to Zachary. *Deal*, 392 F.3d at 852. He testified before this Court that:

-14-

We have some hard data that we can rely on and that is for that period of time when the district really could implement its program, that is the '97/'98 school year, there is discussion and documentation in the record that Zachary did, in fact, make progress on his goals and objectives. Now, in fairness, . . . Zachary was receiving some Lovaas style ABA in the home, . . . so where we can specifically attribute his performance, you know, I would just say it's clearly not attributable to all of one, it's probably a result of everybody working, but he absolutely made progress. . . . He was learning to interact. His language was increasing, and that's all discussed. And I'm not making, it's not my view that he did, it's just all in the documentation after that period.

Addit. Evid., Vol. II, Rostetter Test., p. 373. Dr. Rostetter also testified that HCDE took into

account Zachary's individual requirements and needs. *Id.*, p. 375.

Dr. Freeman also testified that Zachary's IEPs from 1997 forward were reasonably

calculated to enable Zachary to receive educational benefit. Additional Evid. Hearing, Vol. II, p.

483. She testified that Zachary's IEPs were consistent with criteria established by the National

Academy of Science:

> The National Academy recommended a full day program that was offered to Zachary 32-and-a-half hours a week with low student, student to teacher ratios at different times. There was either one to two or one to three or even one to one offered to Zachary. It talks about developmentally appropriate curriculum which was there. It talks about taking a functional approach to behavior plans and every one of the behavioral issues, every one of Zachary's IEPs addressed his issue of repetitive behaviors and addressed the issue of what people were going to teach him to replace those. It also addressed the issue of peers for Zachary. And the peers in the classes proposed at Ooltewah were all higher functioning than Zachary. . . . And the final recommendation was that there be structured, there be manned instruction using a multitude of methods in functional communication, social skills, behavior, readiness, self-help, fine motor, gross motor, and cognitive skills, and goals were written in all of those areas. So when I look at that, I would have to say, yes, this is an IEP that's reasonably calculated to provide Zachary educational benefit.

Addit. Evid., Vol. II, p. 483-84, 489-93. For the 1998-1999 and 1999-2000 school years, Dr.

-15-

Freeman believes the IEPs were reasonably calculated to provide Zachary with educational benefit. *Id.* at 489-93. She testified that HCDE "offered best practices." *Id.* at 509. She further testified that "I firmly believe with all of my heart, okay, and I don't say this lightly, that Zachary would be communicating had he stayed in the school system." *Id.* at 549. Dr. Ilene Schwartz, an HCDE expert at the administrative hearing, also testified that HCDE's IEPs were reasonably calculated to provide Zachary with educational benefit and represented "reasonable to high expectations across a broader number of domains." Admin. Tr., Vol. XXV, Schwartz Test., p. 6720, 6735. She further testified that HCDE was "using practices that are considered recommended or best practices in special education." Admin. Tr., Vol. XXV, p. 6847. Dr. Schwartz is a professor of education at the University of Washington who runs a program for young autistic students there. *Id.* at pp. 6635-39.

Judy Bailey, a behavior analyst and the Associate Director of Professional Support Services with the TEAM Evaluation Center, testified that Zachary's 1999-2000 IEP was calculated to provide more than minimal educational benefit to Zachary. Admin. Op., p. 4; Admin. Tr., Vol. XVIII, Bailey Test., p. 5032. She testified that in drafting the IEP, Zachary's "capabilities had been looked at, that his learning style had been looked at, that his weaknesses had been looked at, and all those areas were addressed in the IEP in a way that would enable him to learn." Admin. Tr., Vol. XVIII, p. 5032-33. Another credible HCDE witness, Jan Lewis, an SLP, testified that Zachary's IEP goals in communication and language were calculated to provide Zachary with educational benefit that would make him be a "more functional communicator or a more functional member of the place that [he] existed." Admin. Op., p. 4; Admin. Tr., Vol. XXI, Lewis Test., pp. 5648-49. Ms. Lewis also testified that communication is

-16-

a very important skill for children with autism. Admin. Tr., Vol. XXI, p. 5641. She further testified that HCDE's program was designed for Zachary to learn to communicate and that had he stayed in HCDE's program "it would have been a slow, easy process for him to work into being able to communicate." *Id.* at pp. 5693, 5747.

Dr. Freeman also found that both Ms. Steele and Ms. Wiesen were adequately trained professionals. Addit. Evid., Vol. II, Freeman Test., p. 485-86. She testified that Ms. Steele had "extensive training" as a certified special education teacher with a masters in early childhood development, as well as extensive training in ABA techniques. *Id.* at 485-86, 467; Admin. Tr., Vol. V, p. 1367. Dr. Freeman also testified that in reviewing a videotape of Ms. Wiesen's class, "[t]here is example after example of discrete trials." Addit. Evid., Vol. II, Freeman Test., p. 468. Ms. Steele expressed to Dr. Freeman the significant progress that Zachary had made during the 1997-1998 school year when he accessed the HCDE program. *Id.* at 485-86.

Ms. Chapman, the HCDE Director of Exceptional Education, testified regarding HCDE's methodologies for Zachary:

> The school's programs for Zachary offered a developmental curriculum based on two known and established sequence of objectives or curriculum, the . . . AEPS and the Brigance. The program used a variety of integrated methodologies, . . . It's a deliberate integrated set of methodologies for a given student that might be effective and it included speech therapy both within the classroom setting and outside the classroom setting, but the most powerful part of the school's IEP to me at least without question is the fact that it had strong methodologies to train Zachary or to assist Zachary in meeting communication intent and socialization, which from my experience of thirty years, is essential for school achievement and for a quality of life that we want for everyone.

Admin. Tr. Vol. XXIII, Chapman Test., pp. 6319-20. She also testified that HCDE incorporated incidental teaching into Zachary's program. *Id.* at Vol. XXIV, p. 6361. Although HCDE's data on progress was nowhere near as detailed as the parents' data of DTT outcomes, HCDE did

-17-

provide the parents with records of Zachary's progress. *Id.* at 6362.

With respect to methodologies, Dr. Freeman testified that "the eclectic approach is the only way that truly provides individualization, whatever eclectic means because that way you're not driven by an approach and does the child learn by this approach, but you've got an armamentarium of knowledge." Additional Evid. Hearing, Vol. II, p. 558. Dr. Schwartz emphasized that with respect to methodologies, "there's no one right approach." Admin. Tr., Vol. XXV, Schwartz Test., p. 6741. Dr. Schwartz also testified that DTT was "embedded into the ongoing preschool activities" at HCDE and that she saw elements of effective programs for autistic students at HCDE. *Id.* at 6818-19. Ms. Chapman testified that the amount of DTT should be flexible according to the needs of the child. Admin. Tr., Vol. XXVI, p. 7177. HCDE's position on methodologies is that a "blended approach is best based on assessment data and based on the individual needs of the child." Admin. Tr., Vol. XXVII, Chapman Test., p. 7324. Ms. Steele testified that in the preschool CDC class, "we were choosing the best of a multitude of many different approaches." Admin. Tr., Vol. V, p. 1469.

Judy Bailey testified regarding training that her center provided to HCDE staff working with autistic students. Admin. Tr. Vol. XVIII, p. 4957. She explained the training in a methodology called PATHS that included using structured teaching, functional analysis, applied behavior analysis and working with students' "academic needs, their treatment needs" and their "behavior needs." *Id.* PATHS also incorporates some elements of TEACCH, a recognized methodology for teaching autistic students, but PATHS "expanded the play and leisure segments of TEACCH and how to generalize that into the community and how to make it functional in the community." *Id.* at 4958-60. HCDE also provided evidence that it used such methodologies as

-18-

"discrete trial methodologies, structured teaching, incidental learning, activity-based instruction, and total communication approach."  Admin. Tr., Vol. VIII, p. 2270.  It also used elements of the Picture Exchange Communication System ("PECS"), another recognized approach for teaching students with autism.  Addit. Evid., Vol. II, Freeman Test., p. 518.

In addition, HCDE provided evidence that its programs produced positive outcomes for a majority of its students with autism who were comparable to Zachary.  Admin. Ex. 547, 596.  Upon the ALJ's insistence that HCDE undertake a comprehensive statistical analysis of its programs for autistic children, HCDE produced evidence that its programs produced positive benefits in either IQs, home adaptive behavior, or educational placement for 55% of students included in the study.  Admin. Ex. 596.  HCDE also produced evidence of five autistic students in its programs who became "indistinguishable."  Admin. Ex. 547.  Although these positive outcomes may not equal completely the outcomes of the 1987 Lovaas study, it is apparent that a school district cannot replicate such research because it may not preselect specific high-functioning verbal autistic students for its programs as Lovaas was able to do.  Admin. Tr., Vol. XXV, Schwartz Test., p. 6824.  In addition, the program upon which the parents insisted through CARD showed results that, in the ALJ's words, "were not as promising as Dr. Lovaas."  Admin. Tr., Vol. III, p. 713-14.  This Court also heard extensive testimony on how the parents' program though CARD was not at all comparable to the original study by Dr. Lovaas. Addit. Evid., Vol. I, Leaf Test., pp. 50-51, 58-59, 87, 24-25, 104-05, 141.

### C.    Parents' Objections to Substantive Programs

The Deals agreed with the 1997-1998 IEP, and it was not until the discussion of

Zachary's ESY program on May 11, 1998 that the Deals first requested HCDE to fund their ABA program.  Admin. Op., p. 7.

During the meetings regarding the drafting of the 1998-1999 IEP, the Deals began having various objections to HCDE's proposed programs for Zachary, such as objections to the amount of SLP therapy he would receive and objections to the goals and objectives as vague, setting low expectations, or watered down.  Admin. Ex. 113; Admin. Tr., Vol. XII, p. 3536-37; Vol. XIII, p. 3696.  The Deals were dissatisfied that HCDE did not incorporate all 600 of their proposed IEP goals into the IEP.

However, Mrs. Deal testified that "the main disagreement is the fact that ABA therapy was not provided to Zachary, and it addresses all kinds of things besides academics."  Admin. Tr. Vol. XVI, Maureen Deal Test., p. 4505.  The ALJ also found that "[t]here was eventual agreement between the HCDE and the parents on the goals and objectives for 1998-99 but disagreement on the student's need for intensive one-on-one ABA instruction."  Admin. Op., p. 9.

It is apparent upon review of the record that the Deals continued to insist on precisely *their* proposed program, including intensive "Lovaas style ABA" through CARD as the *only* appropriate method for teaching Zachary.  Examples in the record of the Deals' insistence upon their program and their refusal to compromise are abundant:

- Mr. Deal testified that Zachary "needed ABA, one-on-one ABA in a nondistracting environment."  Admin. Tr., Vol. XIII, p. 3693;

- Mr. Deal testified that "as long as [Zachary] got one-on-one ABA in a nondistracting environment following the UCLA model, that's what we were shooting for."  Admin. Tr., Vol. XIII, p. 3730;

- Mr. Deal testified that Zachary's "ABA program was a vital component to receive an

education to meet his needs."  Admin. Tr., Vol. XIII, p. 3848;

• Mr. Deal testified that "[w]e felt he needed one-on-one ABA . . ."  Admin. Tr., Vol. XIII, p. 3720.

• Mrs. Deal testified that "[w]e felt that he needed at least 30 hours of ABA . . ."  Admin. Tr., Vol. XV, p. 4140.

• Mrs. Deal testified that Zachary "needed the intensity of a one-on-one ABA program to learn new skills."  Admin. Tr., Vol. XV, p. 4142.

• Mrs. Deal responded affirmatively to whether she was asking the "school system [to] adopt ABA for Zachary as its methodology of teaching Zachary."  Admin. Tr., Vol. XVI, pp. 4416-17;

• The ALJ summarizes the Deals' position as "the disqualifier for the parents is if it's not ABA, it's not the appropriate methodology for the child."  Admin. Tr., Vol. XVI, p. 4425;

• Mrs. Deal testified that a correct summary of part of the parents' minority report expressing their dissatisfaction with the 1998-99 IEP was that they "agreed with the goals and objectives, but [they] disagreed with the methodology that was going to be used at the school versus using ABA to accomplish some of those goals and objectives."  Admin. Tr., Vol. XVII, p. 4617-18;

• Mrs. Deal testifies that "[a]t this point in our relationship" with HCDE, the parents agreed with the goals for Zachary, the disagreement that remained was that HCDE had not "accepted all the methods offered."  Admin. Tr., Vol. XVI, p. 4485.

• On January 14, 1999 the Deals wrote a letter to HCDE staff member, Jane Dixon stating, "[w]e believe it will take a true team effort from us personally and [HCDE] along with the skills and experience CARD representatives have with young autistic children to fully implement all the elements of Zachary's individualized education plan.  That's why we continuously ask the school system to contract with CARD to help provide Zachary the appropriate education that will meet his educational needs.  We believe that CARD should be hired to supervise his ABA program . . ."  Admin. Ex. 163;

• The Deals also insisted to Ms. Dixon that "[e]veryone associated with Zachary's education . . . should be trained in ABA by CARD through CARD's workshop program."  Admin. Ex. 163.

• In their minority report, the Deals assert that "Zachary's ABA program is

crucial to his future."  Admin. Ex. 113.

•     The Deals noted on a sheet relating to parent concerns that "[w]e are concerned that Zachary receives the appropriate education he is entitled to.  This education would include applied behavior analysis therapy . . ."  Admin. Ex. 130.

•     In August of 2000, the Deals wrote to Ms. Chapman that "the IEP written for Zachary is missing the backbone and anchor of Zachary's educational program for the past three years: 1:1 Applied Behavior Analysis in a non-distracting environment that fo

## III.    Legal Analysis

### A.    Standard of Review

Under the IDEA, a party may appeal an administrative decision to a district court.  20 U.S.C. § 1415(i)(2)(A).  District courts receive the administrative record, may hear additional evidence upon request of a party, and grant relief it determines is appropriate based on a preponderance of the evidence.  20 U.S.C. § 1415(i)(2)(B).  District courts are required to conduct a "modified *de novo* standard of review" when reviewing an administrative record under the IDEA.  "Under a modified *de novo* standard of review, the district court reviews the due process hearing *de novo*, but gives 'due weight' to the findings from the state administrative proceeding."  *Diamond v. Michigan*, 431 F.3d 262, 265 (6th Cir. 2005) (citing *Kings Local Sch. Dist., Bd. of Educ. v. Zelazny*, 325 F.3d 724, 728 (6th Cir. 2003); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624 (6th Cir. 1990)).  Under this standard, " '[a] district court is required to make findings of fact based on a preponderance of the evidence contained in the complete record, while giving some deference to the fact findings of the administrative proceedings.' "  *Zelazny*, 325 F.3d at 728 (quoting *Knable v. Bexley City Sch. Dist.*, 238 F.3d 755, 764 (6th Cir. 2001)).  "Due weight" requires a court to conduct an "independent reexamination of the evidence."  *Dong v. Board of Educ. of Rochester Community Schs.*, 197 F.3d 793, 800 (6th Cir.

-22-

1999) (quoting *Doe v. Metropolitan Nashville Public Schs.*, 133 F.3d 384, 387 (6th Cir.), *cert.*

*denied*, 525 U.S. 813, 119 S.Ct. 47, 142 L.Ed.2d 36 (1998)).  However, "[t]he 'preponderance of

the evidence' language in the [IDEA] 'is by no means an invitation to the courts to substitute

their own notions of sound educational policy for those of the school authorities which they

review.'"  *Thomas*, 918 F.2d at 624 (quoting *Board of Educ. of Hendrick Hudson Central School*

*Dist. v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034 73 L.Ed.2d 690 (1982)).

In *Burilovich v. Board of Educ. of Lincoln Consolidated Schs.*, the Sixth Circuit

explained:

> Because administrative findings in IDEA cases should be afforded less deference
> than that given to agencies under the substantial evidence test, and in view of the
> IDEA's preponderance of the evidence standard, we hold that administrative
> findings in an IDEA case may be set aside only if the evidence before the court is
> more likely than not to preclude the administrative decision from being justified
> based on the agency's presumed educational expertise, a fair estimate of the worth
> of the testimony, or both.  A court should defer to the administrative findings only
> when educational expertise is relevant to those findings and the decision is
> reasonable.

208 F.3d 560, 567 (6th Cir. 2000).  The Sixth Circuit further noted that:

> The focus of the Supreme Court and this court upon the presumed educational
> expertise of state and local agencies leads to the conclusion that the amount of
> weight due depends upon whether such expertise is relevant to the decision-
> making process.  As a result, less weight is due to an agency's determinations on
> matters for which educational expertise is not relevant, so that a federal court
> would be just as well suited to evaluate the situation.  More weight is due to an
> agency's determinations on matters for which educational expertise would be
> relevant.

*Id.*

Federal district courts apply a slightly different standard of review of administrative

findings where a district court hears additional evidence beyond the administrative record.  For

example, in *S.H. v. State-Operated Sch. Dist. of City of Newark*, the Third Circuit noted that

-23-

"where the District Court hears additional evidence it is 'free to accept or reject the agency findings depending on whether those findings are supported by the new, expanded record and whether they are consistent with the requirements of the Act.'" 336 F.3d 260, 270 (3d Cir. 2003) (quoting *Oberti v. Board of Educ. of the Borough of Clementon Sch. Dist.*, 995 F.2d 1204, 1220 (3d Cir. 1993)); *see also, School Dist. of Wisconsin Dells v. Z.S.*, 295 F.3d 671, 675 (7th Cir. 2002) (a reviewing court that hears new evidence "will naturally defer less to the administrative decision . . ."); *Alex R. v. Forrestville Valley Comm. Unit Sch. Dist. #221*, 375 F.3d 603, 612 (7th Cir. 2004) (noting that "[t]he more that the district court relies on new evidence, however, the less it should defer to the administrative decision").

## B. Substantive Requirements under IDEA

To be eligible for federal education funding, the IDEA requires states to have policies and procedures in place to ensure that "[a] free appropriate public education is available to all children with disabilities residing in the State. . ." 20 U.S.C. § 1412(a)(1)(A). The statute defines a "free appropriate public education" as

> special education and related services that –
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under section 1414(d) of this title.

20 U.S.C. § 1401(8). The Act defines special education as "specially designed instruction, at no cost to parents, to meet the unique needs of a child with a disability, including–(A) instruction conducted in the classroom, in the home, in hospitals and institutions, and in other settings; and (B) instruction in physical education." 20 U.S.C. § 1401(25). As the U.S. Supreme Court has

noted, a FAPE "consists of educational instruction specially designed to meet the unique needs of the handicapped child, supported by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188-89, 102 S.Ct. at 3042.

The IEP is the means by which school districts provide FAPE to eligible disabled students. An IEP team comprised of a number of interested parties, including teachers, parents, school district administrators, and other relevant third parties must develop the IEP by following a series of detailed procedures. *See* 20 U.S.C. § 1414. The IEP must contain various elements, including "a statement of the child's present levels of educational performance"; "a statement of measurable annual goals, including benchmarks or short-term objectives"; "a statement of the special education and related services and supplementary aids and services to be provided to the child"; an explanation of the extent to which the child will not participate with nondisabled children; and a statement of the projected date for services and the frequency, location, and duration of the services to be provided. 20 U.S.C. § 1414(d)(1)(A). The statement of measurable annual goals must be related to "(I) meeting the child's needs that result from the child's disability to enable the child to be involved in and progress in the general curriculum; and (II) meeting each of the child's other educational needs that result from the child's disability." 20 U.S.C. § 1414(d)(1)(A)(ii).

In *Rowley* the Supreme Court addressed the substantive requirements of FAPE under the IDEA. 458 U.S. at 187-198. The Court made clear that "the requirement that a State provide specialized educational services to handicapped children generates no additional requirement that the services so provided be sufficient to maximize each child's potential 'commensurate with the opportunity provided other children.'" *Id.* at 198. The Court concluded that the " 'basic

floor of opportunity' provided by the Act consists of access to specialized instruction and related services which are individually designed to provide educational benefit to the handicapped child." *Id.* at 201. In discussing the goal of self-sufficiency for disabled children, the Court noted:

> Despite its frequent mention, we cannot conclude, as did the dissent in the Court of Appeals, that self-sufficiency was itself the substantive standard which Congress imposed upon the States. Because many mildly handicapped children will achieve self-sufficiency without state assistance while personal independence for the severely handicapped may be an unreachable goal, 'self-sufficiency' as a substantive standard is at once an inadequate protection and an overly demanding requirement. We thus view these references in the legislative history as evidence of Congress' intention that the services provided handicapped children be educationally beneficial, whatever the nature or severity of their handicap.

458 U.S. at 201 n.23. Further, the *Rowley* Court recognized that "the intent of the Act was more to open the door of public education to handicapped children on appropriate terms than to guarantee any particular level of education once inside." *Id.* at 192. Providing special education "'is not guaranteed to produce any particular outcome.'" *Id.* (quoting S.Rep., at 11, U.S. Code Cong. & Admin. News 1975, p. 1435).

In *Rowley* the Supreme Court adopted a two-part test for determining a school district's compliance with the IDEA:

> First, has the State complied with the procedures set forth in the Act? And second, is the individualized educational program developed through the Act's procedures reasonably calculated to enable the child to receive educational benefits? If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more.

458 U.S. at 206-07. The Sixth Circuit has directed this Court to consider the second question pertaining to the Act's substantive requirements. *Deal*, 392 F.3d at 865.

The Sixth Circuit has previously discussed the parameters of a substantively appropriate

education under the IDEA. In *Thomas* the Court noted that the substantive standard under the IDEA "is satisfied 'by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction.'" 918 F.2d at 620 n.5 (quoting *Doe v. Smith*, 879 F.2d 1340, 1341 (6th Cir. 1989)). In *Kenton County Sch. Dist. v. Hunt* the Sixth Circuit addressed whether a school district must provide a student with the precise education the parents demand. 384 F.3d 269, 281-82 (6th Cir. 2004). The Court noted:

> [The student's] parents want the best for their child. It is a commendable desire. However, we stress that 'an appropriate education is not synonymous with the best possible education . . . It is also not education which enables a child to achieve his full potential; even the best public schools lack the resources to enable every child to achieve his full potential.' . . . the District's resources are limited (both in terms of time and money), and it must make a decision on how to balance all of the conflicting needs of a child such as [the student]. The District had decided on a proper course of action with the input and consent of [the student's] parents. The District thus fulfilled its legal obligation to [the student]. While [the student's] parents understandably desire more, they are not entitled to have the District pay for it.

*Hunt*, 384 F.3d at 281-82 (quoting *Cordrey v. Euckert*, 917 F.2d 1460, 1474 (6th Cir. 1990)); *see also, M.M. v. School Bd. of Miami, Dade Cty., Florida*, 437 F.3d 1085, 1102-03 (11th Cir. 2006) (collecting cases clarifying that IDEA does not require school districts to maximize the potential of disabled students); *Lachmann v. Illinois Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir. 1988) (finding that parents do not have the right under the IDEA to compel a school district to employ a specific methodology for their child). Further, the Sixth Circuit has rejected the notion that a school district must provide an expert on the parents' preferred teaching method as a member of the IEP team. *See Dong v. Board of Educ. of the Rochester Comm. Schs.*, 197 F.3d 793, 801 (6th Cir. 1999); *Burilovich v. Board of Educ. of the Lincoln Consol. Schs.*, 208 F.3d 560, 569 (6th Cir. 2000).

-27-

**C.      Lovaas v. Other Programs**

Many federal courts have struggled to address whether a "Lovaas style ABA" program is a necessary component of an appropriate program for autistic children under the IDEA. Some courts have found that a school district's program was appropriate despite the parents' preference for a "Lovaas style ABA" program. Other courts have determined that the school district's proposed program was not appropriate and that the parents' proposed Lovaas program was appropriate in contrast. However, this Court has not located any authority suggesting that a "Lovaas style ABA" program is the *only* appropriate program for young autistic children under the IDEA.

Although the Sixth Circuit panel in this case dismissed Sixth Circuit precedent as providing a "facile" answer to the Lovaas issue, this Court has been provided with no explanation as to why this precedent should be effectively ignored. For example, in *Renner v. Board of Educ. of the Public Schs. of the City of Ann Arbor*, the Sixth Circuit determined that the parents were not entitled to a 40-hour per week program of "Lovaas-style ABA" therapy and that the school district had proposed an appropriate program. 185 F.3d 635 (6th Cir. 1999). The Sixth Circuit agreed with the state review hearing officer and the district court in rejecting the local hearing officer's decision. *Id.* at 642. The Court noted that the local hearing officer "gave very strong emphasis to one particular approach, which he conceded was academically and professionally challenged as to its efficacy, and concentrated on this approach and its intensive application to the virtual exclusion of other approaches and opinions in his analysis and what he deemed as his 'conclusions of law.'" *Id.* The state review hearing officer found "abundant nontestimonial and extrinsic evidence in the record" to justify a contrary decision from the local

hearing officer.  *Id.* at 643.  The Sixth Circuit agreed with the magistrate judge's determination that "there is simply no consensus within the educational or medical communities on the most effective way to treat autism in preprimary age children."  *Id.* at 646.

Other Sixth Circuit cases have similarly determined that a school district does not have to provide a Lovaas-style program to an autistic student to provide the student with a FAPE.  For example, in *Burilovich*, the Sixth Circuit affirmed the district court's conclusion that the school district's IEP took the autistic student's unique needs into account even though it did not provide the parents' preferred method of teaching based on intensive DTT through the Lovaas method.  208 F.3d at 563, 570-71.  The district court found that the school district's "program set goals for [the student] and created a detailed daily schedule to address each of the goals with a program including both group instruction and one-on-one therapy."  *Id.* at 570-71.  The district court noted that in contrast to the school district's program, it did not see how the parents' "'standard' 40 hours of DTT therapy 'was tailored to'" the student's needs.  *Id.* at 571.  The Sixth Circuit affirmed the district court's decision that the school district had offered a FAPE to the student. *Id.* at 572.  In *Dong*, the Sixth Circuit determined that although the school district's program did not include the intensive DTT that the parents preferred, "[t]he decision not to provide the more intense one-on-one behavioral therapy that the [parents] requested cannot be considered a failure to address [the student's] unique needs."  197 F.3d at 803.  The Sixth Circuit affirmed the district court's holding that the school district's program offered the student a FAPE, noting "[p]laintiffs' belief that the DTT program would be best able to develop [the student's] potential does not mean that it was the only FAPE that the District could offer under the IDEA."  *Id.* at 803.

-29-

Many other courts have reached similar conclusions.  In *Gill v. Columbia 93 Sch. Dist.*

the parents wanted a "Lovaas-style ABA" program for their autistic child.  1999 WL 33486649

(W.D. Mo. 1999).  The court noted that "[p]laintiffs' evidence that the Lovaas one-on-one

program would have been better is not sufficient to persuade this court that the program offered

would not have provided substantial benefit to [the student]."  *Id.* at *13.  The court further

acknowledged that:

> [p]arental preferences must be taken into consideration in deciding IEP goals and
> objectives and in making placement decisions, but parental preference alone
> cannot be the basis for compelling a school district to provide a certain
> educational plan. . . . Parents, 'no matter how well-motivated, do not have a right
> under the [IDEA] to compel a school district to provide a specific methodology in
> providing for the education of their handicapped child.'

*Id.* at *14 (quoting *Lachman*, 852 F.2d 290 (7th Cir. 1988) (other citations omitted)).  In *Gill* the

parents complained that the IEP was not specific enough with respect to the amount of direct

one-on-one instruction.  The court responded that "[b]y its nature, an IEP lacks specificity so that

many different methods and techniques can be used to meet a child's specific educational needs

and goals."  *Id.* at *12.

In *Pitchford v. Salem-Keizer Sch. Dist. No. 24J*, the parents argued that "instruction

centered ABA principles and discrete trials is uniformly considered the most effective method of

teaching autistic children" and that the district's failure to provide such a program denied their

child FAPE.  155 F.Supp.2d 1213, 1230 (D. Ore. 2001).  The district court disagreed.  The court

noted that the Lovaas methodology had supporters, as well as detractors.  *Id.*  Further, the district

court noted that Lovaas' original study involved high functioning children and that "by

preselecting high functioning children, the study 'was skewing the sample to be higher, more

promising language-capable children.'"  *Id.*  Thus, the court determined that "while Lovaas

-30-

admittedly benefits some children, its general applicability to the broad range of autistic children is not clear." *Id.* at 1230-31. The student in *Pitchford* was not a high functioning autistic student. The court concluded that "[t]he issue, therefore, is *not* whether other methods may have existed that were more effective than that chosen by the district, but whether the method chosen by the district was *itself* reasonably calculated to afford educational benefit. That being the precise question before me, I conclude that the district's TEACCH-based method of instruction was indeed reasonably calculated to afford educational benefit." *Id.* at 1231.

In *Tyler v. Northwest Indep. Sch. Dist.*, the parents became "ardent adherents of the Lovaas methodology" who did not want any other program implemented. 202 F.Supp.2d 557, 563 (N.D.Tex. 2002). The court declined to hold that the district's use of a "variety of methodologies" failed to meet the "basic floor of opportunity" required by the IDEA. *Id.* Plaintiff's argument that the defendant district must demonstrate that its program was equal to or exceeded the Lovaas program was unfounded. The court noted that its job was not to resolve issues of methodology. *Id.* (citing *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1044 (5th Cir. 1989); *see also J.P. v. West Clark Comm. Schs.*, 230 F.Supp.2d 910 (S.D. Ind. 2002); *T.B. v. Warwick Sch. Dept.*, 2003 WL 22069432 *19 (D.R.I. 2003) (comparing DTT and TEACCH both as "acceptable methodologies for educating autistic children" and noting that there exists a "lack of consensus within the medical and educational communities as to which program is more effective").

In *Brown v. Bartholomew Consol. Sch. Corp.*, the district court again faced a debate over methodologies for teaching autistic children. 2005 WL 552194 *10 (S.D. Ind. 2005), *vacated and remanded* __ F.3d __ 2006 WL 784953 (7th Cir. 2006) (vacated and remanded to district

court to dismiss case as moot because student moved to new school district).  The plaintiffs were represented by plaintiffs' attorney in this case.  As in this case, the parents argued that the student's at-home ABA program was the only way to educate him appropriately.  *Id.*  The parents demonstrated evidence of the student's progress in his ABA program.  *Id.* at *11.  However, the court noted that evidence of progress in the ABA program did not "establish that ABA was the *only* way for [the student] to be educated, or that it was unreasonable at the time to suppose that [the student] could receive meaningful educational benefits from a program that did not include ABA."  *Id.*  The court concluded that:

> Here the [parents] have shown instead only an honest disagreement among professionals who have devoted their careers to educating children with autism spectrum disorders and related disabilities.  The fact that one side is especially fervent about its views does not transform this case into anything other than a methodological dispute.

*Id.*  As the court recognized in *Brown*, the question under the IDEA "is not whose expert opinions are more reasonable, or whose program is better in some ultimate sense.  The question is whether the school district's Proposed IEP was reasonably calculated to provide meaningful educational benefits to [the student]."  *Id.* at *12.

Plaintiffs in *Z.F. v. South Harrison Comm. Sch. Corp.*, argued that the school district's autism program proposed for the student was "impermissibly eclectic."  2005 WL 2373729 *12 (S.D. Ind. 2005).  However, the court responded that "[t]his kind of flexible and varied approach is consistent with the IDEA's requirement that educational approaches be tailored to a child's individual needs.  The IDEA does not specify any particular methodology and does not prohibit the use of multiple methods."  *Id.  See also J.K. v. Metropolitan Sch. Dist. Southwest Allen Cty.*, 2005 WL 2406046 *18 (N.D. Ind. 2005) (affirming determination that autistic student was not

denied FAPE by district's refusal to supply student with 40 hours of ABA in-home methodology); *Adams v. State of Oregon*, 195 F.3d 1141, 1149 (9th Cir. 1999) (noting that although Lovaas program is an excellent program, "there are many available programs which effectively help develop autistic children" and relying on Dawson & Osterling article relied upon by HCDE in this case); *Dong v. Board of Educ. of the Rochester Comm. Schs.*, 197 F.3d 793, 803 (6th Cir. 1999)(finding that crux of dispute over IEP resulted from debate over competing methodologies of TEACCH program and DTT program, but district's failure to implement parents' requested DTT program did not fail to take into account student's unique needs).

### D. ALJ Error

This Court finds that the ALJ erred in applying the law in this case because he applied an improper standard. Instead of evaluating whether HCDE's IEPs were appropriate and reasonably calculated to provide educational benefit, he required HCDE to demonstrate that its proposed programs were as good as or better than, not only the parents' CARD based Lovaas program, but the outcome of the 1987 Lovaas study itself. In *G v. Fort Bragg Dependent Schs.*, the Fourth Circuit addressed this same issue:

> The [initial hearing officer's] determination, however, does not appear to have been based on an evaluation of the evidence under the proper standard. Rather than assessing [the school district's] ability to provide [the student] educational benefit under the April 1997 IEP, the [initial hearing officer] assessed [the school district's] ability to replicate the complete Lovaas therapy. That is, the [initial hearing officer's] conclusion was premised not on an analysis of whether the April 1997 IEP was 'reasonably calculated to provide educational benefit' to G, but instead on an examination of whether that IEP would replicate the benefit to [the student] of the complete Lovaas therapy, which had been successful for him.

343 F.3d 295, 306 (4th Cir. 2003). As the Fourth Circuit noted in another case, *County Sch. Bd. of Henrico Cty. v. Z.P.*,

> Neither a state administrative hearing officer nor a reviewing court may reject an otherwise appropriate IEP because of dissatisfaction with the educational methodology proposed in the IEP. If an IEP is 'reasonably calculated to enable the child to receive educational benefits,' . . . the hearing officer cannot reject it because the officer believes that a different methodology would be better for the child.

399 F.3d 298, 308 (4th Cir. 2005) (citing *Rowley*, 458 U.S. at 207, 102 S.Ct. 3034).

Moreover, although this Court is required to give deference to the methodological decisions of state and local educational authorities, the hearing officer is also required to give deference to the opinions of local educators. *See Rowley*, 458 U.S. at 206, 102 S.Ct. at 3050; *Hartmann by Hartmann v. Loudon Cty. Bd. of Educ.*, 118 F.3d 996, 1001 (4th Cir. 1997) (noting that "[l]ocal educators deserve latitude in determining the individualized education program most appropriate for a disabled child"); *Devine v. Indian River Cty. Sch. Bd.*, 249 F.3d 1289, 1292 (11th Cir. 2001) (noting that "great deference must be paid to the educators who develop the IEP"); *Wagner v. Board of Educ. of Montgomery Cty., Maryland*, 340 F.Supp.2d 603, 611 (D. Md. 2004) (finding that "this court owes generous deference (as did the ALJ) to the educators on [the student's] IEP team"); *M.M. v. School Dist. of Greenville Cty.*, 303 F.3d 523, 533 (4th Cir. 2002) (administrative officers "must give appropriate deference to the decisions of professional educators"). As one court in this Circuit described it:

> Thus, if the district court is to give deference to the local school authorities on educational policy issues when it reviews the decision from an impartial due process hearing, it can only be that the ALJ presiding over such a hearing must give due weight to such policy decisions. For it to be otherwise, would be illogical; to prevent an ALJ from giving proper deference to the educational expertise of the local school authorities and then require such deference by the district court would be inefficient and thus counter to sound jurisprudence.

*Johnson v. Metro Davidson Cty. Sch. System*, 108 F.Supp.2d 906, 915 (M.D. Tenn. 2000).

In this action the ALJ clearly treated the Deals as if they were on a par with Hamilton

County's professional educators, even though neither Mr. Deal nor Mrs. Deal is a professional

educator. In addition, although the IDEA requires school districts to develop IEPs based on the

unique needs of the individual child, parents like the Deals and their attorney appear to contend

that programs such as the Deals provided here, consisting of 30 to 40 hours per week of ABA

therapy and a mainstream preschool program are the *only* appropriate ways to educate children

with autism. *See e.g., L.B. v. Nebo Sch. Dist.*, 379 F.3d 966, 968 (10th Cir. 2004) (Deals'

attorney arguing that other autistic child needed 40 hours of ABA programming plus additional

hours in mainstream private preschool); *T.H. v. Board of Educ. of Palatine Comm. Consol. Sch.*

*Dist.*, 55 F.Supp.2d 830, 836 (N.D. Ill. 1999) (Deals' attorney represented parents who wanted

"intensive ABA/DTT Lovaas program" in the student's home for 35-40 hours per week); *Brown*,

2005 WL 552194 *10 (S.D. Ind. 2005)(Deals' attorney represented parents who argued that the

student's at-home ABA program was the only way to educate him appropriately).

Throughout the course of the twenty-seven day administrative hearing, the ALJ

consistently questioned the witnesses about the efficacy of HCDE's program *as compared* to the

results of the 1987 Lovaas study. *See* Admin. Tr., Vol. II, pp. 317-18; Admin. Tr., Vol. VIII, p.

2379-81, 2316-18, 2369-70; Vol. V, p. 1495; Vol. XVII, p. 4782-84. The ALJ also focused

heavily throughout the hearing on the lack of specific outcome data for other methods of

teaching autistic children aside from the Lovaas study. Admin. Tr., Vol. II, p. 632, 637, 655;

Vol. III, p. 719; Vol. IV, p. 976; Vol. VI, pp. 1646, 1656, 1659-60, 1798; Vol. VII, pp. 2041-42,

2122-24, 2176; Vol. VIII, p. 2270-71, 2381; Vol. V, p. 1475, 1484-85; Vol. XX, p. 5387; Vol.

XXIV, p. 6454-55.

For example, the ALJ asked Dr. Speraw if she has "seen any children in the Hamilton

County school setting that have progressed to the level that the successes in the Lovaas study progressed to?" Admin. Tr., Vol. II, pp. 317-18. The ALJ also asked that if Lovaas was correct in the claims of his study "would you feel it inappropriate for any . . . teacher teaching autistic children, to use a system other than that assuming those other systems don't have those kinds of supporting data?" Admin. Tr., Vol. VII, p. 2122. The ALJ wanted to know what specific percentages of HCDE students "became indistinguishable in the regular classroom." Admin. Tr., Vol. VIII, p. 2271. He also questioned HCDE witnesses whether they have the "50 percent success rate as Lovaas purports to achieve." Admin. Tr., Vol. VIII, p. 2379. At one point, he indicated that he's "been begging for any scientific data" and asked whether the "best scientific data we have is for Lovaas." Admin. Tr., Vol. VIII, p. 2381. The ALJ stated during the hearing:

> The issue here for me is really fairly clear, is that ABA has come on the scene and it's making claims that at least so far, and the testimony has been, are rather extraordinary. And so what [Mrs. Deal] believes about the qualifications of Hamilton County teachers, I don't think it really in issue. The issue is whether or not she believes and is correct in believing that the ABA therapy is the thing that can save Zachary's life, if you will, or whether other things are appropriate.

Admin. Tr., Vol. XVI, p. 4423. Towards the end of the lengthy administrative hearing, the ALJ stated that "this hearing's been about Lovaas-style ABA and its efficacy . . ." Admin. Tr., Vol. XXVII, p. 7314.

The ALJ's tendency to compare the HCDE's proposed program with the 1987 Lovaas study continues in the ALJ's written opinion. The ALJ stated that the "data produced for the hearing indicate that approximately 14% of autistic children receiving only the HCDE program went on to become 'indistinguishable' from the children in regular education classrooms. This does not compare favorably to the 47% rate reported by Dr. Lovaas and apparently being achieved at the replication sites." Admin. Op., p. 16. He concluded that "HCDE also failed to

-36-

produce convincing evidence that their methodology for young children with autism was equal to or better than a program based primarily on an intensive ABA intervention. The preponderance of the evidence weighed heavily in favor of Lovaas style ABA as the appropriate methodology for educating Z.D." *Id.* at 17. He ruled that "an appropriate methodology for Z.D. must include an intensive Lovaas style ABA component." *Id.* at 18. The ALJ errs by assuming that there is only *one* appropriate methodology for educating an autistic child like Zachary. This Court gives little weight to the ALJ's legal conclusion of substantive inappropriateness because it is clear from the record and the administrative opinion that the ALJ improperly compared the 1987 Lovaas outcomes with HCDE's program instead of analyzing whether HCDE's program was designed to provide educational benefit to Zachary. *See e.g., Renner*, 185 F.3d at 642.

The ALJ also erred by failing to consider the wealth of evidence provided at the hearing that there is no one correct methodology for teaching autistic children, as well as evidence critiquing the Lovaas method. Admin. Ex. 433, 435, 438, 513, 544; Admin. Tr., Vol. XXV, Schwartz Test., p. 6714, 6898, 6742, 6658-59, 6686-87, 6696-6700. As Dr. Schwartz put it, "there's no one right way to treat children with autism." Admin. Tr., Vol. XXV, Schwartz Test., p. 6708. There are other strategies that "are as effective" as Lovaas style ABA. *Id.* at 6711. The ALJ also ignored testimony indicating that the parents' CARD program was not identical to the 1987 Lovaas study and did not demonstrate the same results. Admin. Tr., Vol. XXV, Schwartz Test., pp. 6737-38; Admin. Tr., Vol. II, Amerson Test., p. 714. The ALJ also apparently gave little weight to the fact that Zachary lacked a functional communication system and clearly was not comparable to the best outcome students in the Lovaas study.

The ALJ further distorted the testimony in the record in order to support his legal

conclusion that "an appropriate educational methodology for Z.D. must include an intensive Lovaas style ABA component." Admin. Op., p. 18. For example, he twisted the testimony of one of HCDE's highly qualified experts, Dr. Ilene Schwartz. In finding of fact number 181, the ALJ, citing Dr. Schwartz, found that a "well constituted IEP team must have someone on it who is knowledgeable about Lovaas style ABA . . ." *Id.* at p. 13. However, Dr. Schwartz actually testified that an IEP team should contain someone who has "some knowledge of autism and applied behavior analysis." Admin. Tr., Vol. XXV, p. 6901. As the ALJ heard from numerous witnesses, "Lovaas style ABA" and traditional applied behavior analysis are not synonyms. In addition, the ALJ and this Court heard testimony indicating that both Ms. Steele and Ms. Wiesen had knowledge of ABA theories. In finding of fact number 190, the ALJ cited Dr. Schwartz as testifying that intensive one-on-one ABA needs to be a component of an autistic student's program. Admin. Op., p. 13. However, Dr. Schwartz did not testify that the intensive ABA therapy needed to be in a one-on-one setting. Admin. Tr., Vol. XXV, Schwartz Test., p. 6908. In finding of fact number 191, the ALJ found that Dr. Schwartz "believes that eighteen hours a week of intensive discreet [sic] trial ABA interventions should be a minimum level for a program for an autistic child similar to the student." Admin. Op., p. 13. Dr. Schwartz actually testified that she would have a hard time stating at what intensity level she believes Zachary should have DTT. Admin. Tr., Vol. XXV, p. 6923. She then stated, "I can tell you what I do. We do twelve hours a week of preschool, of integrated preschool where people use activity-based instruction, and we do eight hours . . . a week of more intensive instruction, and that's kind of what I would say I would do minimally." *Id.* She indicated the setting might be one-on-one or two-on-one, and it is unclear from the testimony whether those ratios apply to the twelve

-38-

hours of integrated preschool. *Id.* Integrated preschool with activity-based instruction does not appear to this Court to be synonymous with "intensive discreet [sic] trial ABA interventions."

Further, the ALJ accepted certain testimony while rejecting credible testimony and external evidence tending to dampen the accepted testimony. For example, the ALJ consistently mentioned Zachary's IQ gains over time, while failing to mention that these IQ scores were obtained on a nonverbal intelligence test known for providing information about only a narrow set of skills that tested Zachary's strength areas. *See* Admin. Op., p. 9, 12. He also failed to mention scores on tests like the Vineland Adaptive Behavior Scale which showed Zachary's scores going down over time. Admin. Ex., 515.

Thus, this Court finds that the ALJ erred in being predisposed to determine that "Lovaas style ABA" was the *only* appropriate method for teaching Zachary by failing to consider the facts in the entire record from credible witnesses and the abundance of extrinsic evidence indicating that the scientific community has not reached any consensus that there is only *one* right way to teach autistic children. *See Renner*, 185 F.3d at 642. As Dr. Schwartz noted, "as a consensus, the field, I think the field is quite strong in saying that" there is no one best way or only way to program for young children with autism. Admin. Tr., Vol. XXV, Schwartz Test., p. 6708; *see also id.* at 6711; Admin. Tr. Vol. XVII, p. 4761.

E.    **Substantive Appropriateness of HCDE's IEPs**

The facts of this case are similar to the facts found in *West Clark Comm. Schs.* 230 F.Supp.2d 910. In that case the parents preferred their intensive ABA therapy program for their autistic child over the school district's "eclectic" program. As in this case, the parents in *West Clark* argued that "the ABA/DTT approach they favor is the only reasonable method for

-39-

teaching J.P." and that such a program "is so far superior to other programs that it should be recognized by the Court as the only reasonable way to teach autistic children like J.P." *Id.* at 916-17. In contrast, the school district preferred to "use a variety of techniques which it argue[d] have proven to be successful in teaching autistic children." *Id.* at 916. The district used some ABA/DTT training and a structured classroom that it believed facilitated the development of functional communication. *Id.* Like Zachary Deal in this case, the student in the *West Clark* case had the greatest difficulty with functional communication. *Id.* at 922. Like the parents in this case, the parents in *West Clark* faulted the school district's record-keeping, criticized the district's IEP goals, and wanted the district to recognize the ABA program as the only appropriate means of educating their child. *Id.* at 927, 931. The parents requested a minimum of 40 hours of home and school ABA training under supervision of an organization similar to CARD with monthly training requirements by their preferred organization, the use of an aide at school trained in ABA or provided by their chosen organization, the addition of a member of their chosen organization on the IEP team, ESY, more extensive data collection, and reimbursement for the costs associated with their chosen program. *Id.* at 927.

As in this case, the parents presented the expert testimony of Dr. Mulick who apparently supported their position that the parents' ABA program was the only appropriate way to teach the student. *West Clark Comm. Schs.*, 230 F.Supp.2d at 936 n.7.[3] The school district presented much testimony criticizing the Lovaas study. *Id.* at 929. One of the district's experts noted that "the 'methodological flaws' in the 1987 [Lovaas] study 'are so significant that I don't think the

---

[3] Indeed, Dr. Mulick appears to suggest an intensive ABA treatment program for autistic children in several other cases around the country. *See e.g. Nebo Sch. Dist.*, 379 F.3d at 972; *Pitchford*, 155 F.Supp.2d 1213, 1230 (D. Or. 2001); *T.H.*, 55 F.Supp.2d at 841 n.13.

data can be relied on for much of anything,'" and he expressed the concern that "children trained

solely by the discrete trial format tend not to generalize very well and tend not to retain their

skills well." *Id.* at 929. Such criticisms were echoed in the hearing before the ALJ. *See* Admin.

Tr., Vol. XVII, Palmer Test., pp. 4757-4759, 4785; Vol. XVIII, Bailey Test., p. 5044; Vol. XXI,

Lewis Test., p. 5668, Vol. XXV, Schwartz Test., pp. 6659-62, 6686, 6696, 6700, 6713-14, 6742,

6898; Admin. Exs. 433, 513, 544, 418.

In addressing whether the district's "eclectic" program was inappropriate, the court

noted:

> Of course, neither the *Palatine* Court, nor any other court of which this Court is
> aware has held in general terms that taking an eclectic approach, *i.e.* attempting to
> utilize the best ideas from more than one educational theory, is in and of itself
> unsound policy. The question of whether an approach used in any particular case
> "qualifies" as a sound educational practice is fact-specific.

*West Clark Comm. Schs.*, 230 F.Supp.2d at 935 (citing *T.H.*, 55 F.Supp.2d 830). The court in

*West Clark Comm. Schs.* determined that:

> [a]n educational approach proposed by a school district for teaching a disabled
> child meets the legal test for soundness if: (a) the school district can
> articulate its rationale or explain the specific benefits of using that approach in
> light of the particular disabilities of the child; (b) the teachers and special
> educators involved in implementing that approach have the necessary experience
> and expertise to do so successfully; and (c) there are qualified experts in the
> educational community who consider the school district's approach to be at least
> adequate under the circumstances.

230 F.Supp.2d at 936. In finding that the school district satisfied these requirements, the court

noted that it proposed to use a variety of techniques designed for autistic students, including a

PECS, DTT, and group time. *Id.* at 938. The students' teachers were also familiar with the

needs of autistic children. *Id.* Further, the district presented expert testimony that the student's

program in the school district was an effective one. *Id.*

-41-

In this case HCDE provided adequate evidence of the substantive appropriateness of its proposed IEPs for Zachary. The parents agreed with the IEP for the 1997-1998 school year, and it was not until May of 1998 that they first requested HCDE to pay for an intensive ABA program. There is thus no question that the 1997-1998 goals and objectives were appropriate for Zachary. Further, the Deals had great confidence in Ms. Steele and her experience. Ms. Steele testified that she worked from a whole "toolbox" of potential methodologies that were geared to the individual child's needs and abilities. Thus, this Court finds that the 1997-1998 IEP was substantively appropriate.

For the 1998-1999 school year, the parents filed a minority report stating their objections to the proposed IEP. The parents proposed 600 goals of which the IEP team added 137 to the IEP. Although the parents felt that the IEP goals were "watered down", HCDE presented evidence to this Court that 600 goals is not appropriate on an IEP. Dr. Leaf testified that 600 goals "is not my preference. I go on IEPs all of the time and try to eliminate goals so we have a number that's more manageable and to a number that teachers can more consistently apply." Addit. Evid. Hearing, Vol. I, p. 70. He testified that "more isn't better, that you can't get the same effectiveness." *Id.* He also testified that you have to take into account practical considerations of how often you can work on each individual goal. *Id.* at 72.

The parents eventually agreed with the goals and objectives, but wanted Zachary to receive intensive one-on-one ABA instruction. Admin. Op., p. 9. Although the ALJ did not find Zachary's 1998-1999 preschool teacher, Paula Wiesen, credible, it is undisputed that she was an experienced SLP who used functional communication throughout Zachary's school day. *See* Admin. Tr., Vol. V, Wiesen Test., p. 1497; Vol. XVI, Maureen Deal

Test., p. 4390. Functional communication was the area of Zachary's greatest deficit. Further, although Zachary only attended HCDE's program 16% of the time that year, the evidence shows he made progress on the goals and objectives of his IEP. *See* Admin. Ex. 105.

For the 1999-2000 school year, Zachary's IEP represented detailed present levels of performance, goals and objectives, and a specially designed program to enable Zachary to achieve educational benefit. *See* Admin. Ex. 253. The program called for a full day of instruction with weekly speech and language therapy sessions accompanied by some occupational therapy and physical therapy sessions on a less routine basis. The 1999-2000 IEP also provided that Zachary would attend a regular education kindergarten for fifteen minutes three times per week *to increase as tolerated*. Admin. Ex. 253. The ALJ ignored the qualifying language written into the IEP itself which indicates that Zachary could receive as much integration in the regular kindergarten program as he could tolerate. Although Zachary did not attend HCDE's program during the 1999-2000 school year, HCDE remained ready and willing to implement the full-day program should he choose to access it.

HCDE's IEPs complied with the requirements found in 20 U.S.C. § 1414(d)(1)(A). Further, HCDE presented several experts who testified before this Court and the ALJ who indicated that the IEP goals and objectives were appropriate. Addit. Evid., Vol. II, Rostetter Test., pp. 373, 375. HCDE also presented experts who testified that Zachary's IEPs were reasonably calculated to enable Zachary to achieve educational benefits. *Id.* at Vol. II, Freeman Test., pp. 483-84, 489-93; Admin. Tr., Vol. XXV, Schwartz Test., pp. 6720, 6735. HCDE presented evidence from experts who testified that HCDE used "best practices" in their educational programs for autistic children. *See* Admin. Tr., Vol. XXV, Schwartz Test., p. 6847;

Addit. Evid., Vol. II, Freeman Test., p. 509. Further, HCDE presented evidence of its blend of appropriate methodologies that were tailored to the needs of each individual child and evidence of the qualifications of its educators. It presented evidence of identifiable methodologies that it uses in its programs, including PATHS, DTT, PECS, structured teaching, and incidental teaching. HCDE also presented evidence of the positive outcomes the majority of autistic students in its program achieved. Admin. Ex. 597.

This evidence is similar to what other federal courts have deemed relevant to the determination of an appropriate IEP. *See Board of Educ. of Cty. of Kanawha v. Michael M.*, 95 F.Supp.2d 600, 610 (S.D.W.Va. 2000) (noting that appropriateness of IEP and methodologies may be demonstrated by the use of experts); *West Clark Comm. Schs.*, 230 F.Supp.2d at 936.

This Court thus concludes that, based on the whole record, HCDE's proposed educational programs for Zachary were appropriate. Were HCDE's programs as good as the educational programs the parents developed for Zachary, which included significant hours of one-on-one intensive ABA instruction? Perhaps not. But that is not the relevant question. *See Fort Bragg Dependent Schs.*, 343 F.3d at 306; *Pitchford*, 155 F.Supp.2d at 1231. Since it finds HCDE's programs appropriate, this Court declines to consider the appropriateness of the parents' program.

The Court is aware that there are some courts that have ordered school districts to provide intensive one-on-one ABA to an autistic student where the district's program was inappropriate. For example, in *T.H. v. Board of Educ. of Palatine*, the school district proposed a program that consisted of 2.5 hours of programming per day for four days per week with goals in only most of the relevant areas established through little actual discussion. 55 F.Supp.2d at 836.

In contrast, HCDE's program always provided for full-day programs with extensive and detailed goals and objectives drafted in all of Zachary's areas of need after extensive discussions.

The Sixth Circuit has cautioned this Court to pay careful attention to Zachary Deal's potential. The Sixth Circuit noted that "[t]he ALJ cited to extensive evidence tending to suggest that the approach offered by the School System provides little or no chance for self-sufficiency for an autistic child while under the Lovaas approach, self-sufficiency is a real possibility." *Deal*, 392 F.3d at 861.

While this Court is not prepared to judge Zachary as having little chance self-sufficiency at some point in the future, the U.S. Supreme Court has made clear that self-sufficiency is not the substantive standard under IDEA. *Rowley*, 458 U.S. at 201 n.23. In addition, although the ALJ lauded Zachary's gains in IQ, he ignored evidence that these gains were all achieved on a *nonverbal* IQ test that addressed only a narrow set of skills that matched Zachary's strengths. He also ignored the fact that Zachary's standard scores on other assessments went down over time. Admin. Ex. 515. The ALJ further dismissed the fact that after several years of intensive ABA therapy in the Deals' chosen "Lovaas style" program, Zachary continued to be nonverbal with no functional communication system. Admin. Tr., Vol. XXV, p. 6760. Even in 2002, when Zachary was eight years old, he still was primarily nonverbal without a functional communication system. This Court and the ALJ heard significant testimony about the importance of a functional communication system for becoming productive in society or having a chance at being "indistinguishable." Unfortunately, Zachary does not appear to be like one of the "best outcome" students identified in the 1987 Lovaas study.

Moreover, although the ALJ was impressed by, and relied upon, the outcomes achieved

by Lovaas, the evidence before the ALJ, and certainly the evidence presented to this Court, clearly demonstrated that the CARD program the parents insisted HCDE implement was not comparable to the 1987 Lovaas study. Addit. Evid. Hearing, Vol. I, pp. 24-25. 104-05, 41, 50-51, 58-59, 87, 141; *see also* Admin. Tr., Vol. III, Amerson Test., p. 714; Vol. XXV, Schwartz Test., pp. 6737-38. Therefore, this Court cannot assume that the parents' CARD program ever had the chance of demonstrating the kind of results for Zachary that the original 1987 Lovaas study demonstrated for the autistic children in that study.

The Sixth Circuit made it clear that "there is a point at which the difference in outcomes between two methods can be so great that the provision of the lesser program could amount to a denial of a FAPE." *Deal*, 392 F.3d at 862. However, Zachary Deal does not appear to have the skills at this point in time to become "indistinguishable" in the Lovaas sense of that term. After several years of intensive one-on-one ABA training, Zachary is far from indistinguishable, and in fact, has very little functional communication. Based on the credible evidence in this case before the ALJ and this Court, this Court finds that, due to Zachary's low skills in certain critical areas like functional communication and the disparities between the CARD program and the actual 1987 Lovaas study, this is not a case where the difference in education can mean the difference between a life of self-sufficiency and a life of dependence. *See Deal*, 392 F.3d at 863. Although this Court does not wish to dampen any hopes that the Deals have for eventual self-sufficiency for Zachary, it is clear that Zachary's skills at the time of the additional evidence hearing did not indicate the skills of a child moving towards self-sufficiency or "indistinguishability" at the rapid pace discussed in the 1987 Lovaas study.

After extensively analyzing Zachary's potential, this Court concludes that HCDE's

substantive educational programs for Zachary were appropriate and met the requirements of the IDEA.

**IV.    Conclusion**

After reviewing the entire record and the applicable law, this Court concludes that HCDE's proposed IEPs for Zachary Deal were reasonably calculated to offer Zachary educational benefit and were substantively appropriate under the IDEA in all relevant years.

_____*/s/ R. Allan Edgar*_____
R. ALLAN EDGAR
UNITED STATES DISTRICT JUDGE